Judge LANSING,
Dissenting.
I concur with Part III(A) of the majority opinion, but I respectfully dissent from Part III(B). In my view, the district court’s decision should be reversed, and the suspension of Wheeler’s driver’s license should be vacated, because he met his burden to prove that his breath alcohol test was not administered in compliance with governing standards.
It is helpful to begin with a brief review of the development of the statutory law eon *387 eerning testing of drivers for alcohol concentration in the breath, blood or urine. In 1972, when the DUI statutes were codified in Title 49 of the Idaho Code, the legislature added the following provision to I.C. § 49-1102: “Chemical analysis of blood, urine or breath for the purpose of determining the blood alcohol level shall be performed by a laboratory operated by the Idaho department of health or by a laboratory approved by the Idaho department of health under the provisions of approval and certification standards to be set by that department.” 1972 Idaho Sess. Laws, ch. 155, § 1 at 342. The stated purpose of the amendment was to “provide for better uniformity and accuracy” in testing. Statement of Purpose, HB 580 (RS 3616) (1972). The DUI statutes were later recodified into Title 18, and in 1987, the legislature added the following provision to I.C. § 18-8004(4):
Notwithstanding any other provision of law or rule of court, the results of any test for alcohol concentration and records relating to calibration, approval, certification or quality control performed by a laboratory operated or approved by the Idaho department of health and welfare or by any other method approved by health and welfare shall be admissible in any proceeding in this state without the necessity of producing a witness to establish the reliability of the testing procedure for examination.
1987 Idaho Sess. Laws, ch. 122, § 2 at 247, 249-50. The legislative purpose of this provision making the test results admissible in judicial proceedings without witness testimony concerning the reliability of the testing equipment and procedure was, in part, to “make the practice uniform around the state ... and to avoid the ‘economic burden to the state to have to furnish witnesses to provide superfluous verification.’ ” Statement of Purpose, HB 284 (RS13389) (1987). Subsequently, the responsibility for setting testing standards for laboratories and other test methods was shifted to the Department of Law Enforcement, 1988 Idaho Sess. Laws, ch. 47, § 4 at 54, 65, which was later renamed the Idaho State Police (ISP). 2000 Idaho Sess. Laws, ch. 469, § 1 at 1450, 1456.
As the legislative statements of purpose indicate, this statutory scheme is intended to streamline trials and reduce the costs of prosecution while at the same time assuring the accuracy of the tests. It can meet this objective and can accord with due process and demands of fundamental fairness only if there actually exist promulgated standards for administration of BAC tests that ensure accurate and reliable test results. In other words, the quid pro quo for the convenience and economy of admitting test results pursuant to I.C. § 18-8004(4) is that the ISP must promulgate ascertainable standards that, if complied with, will yield accurate BAC testing.
If a driver fails a breath test that was administered in conformity with ISP standards, significant consequences follow for the driver, quite apart from any prosecution for driving under the influence. The individual’s driver’s license is immediately seized by a law enforcement officer and the driver will be given a notice of suspension and a temporary driving permit. I.C. § 18-8002A(5)(a). If no hearing is requested, the driver’s license will be suspended by the Idaho Transportation Department for a period of 90 days for the first failure of an evidentiary test and for a period of one year for a second and any subsequent failure of an evidentiary test within a five-year period. I.C. § 18-8002A(4).[5] The driver has a right to request a hearing within seven days of the notice of suspension. I.C. § 18-8002A(7). If a hearing is requested, the burden will be upon the driver to show cause why the license should not be suspended. I.C. § 18-8002A(7). A driver may do this by showing, among other things, that the BAC test administered by the officer was “not conducted in accordance with the requirements of § 18-8004(4).” I.C. § 18-8002A(7). The hearing will be an informal proceeding before a hearing officer designated by the Idaho Transportation Department, I.C. § 8002A(7). Because this administrative hearing is not a criminal or judicial proceeding, the constitutional protections afforded to one charged with a crime do not apply — there is no right to appointed counsel for the indigent nor any right to confront *388 adverse witnesses. In addition, the rules of evidence that govern judicial proceedings do not apply, I.C. § 67-5251, I.R.E. 101(b), and the burden of proof rests on the driver rather than on the State. I.C. § 18-8002A(7).
The ISP has not formally promulgated administrative rules prescribing testing equipment or requirements for its maintenance and operation. Instead, the ISP has announced its approved breath testing methods through standard operating procedures manuals and training manuals describing how to use approved breath test instruments, including the Intoxilyzer 5000. See I.D.A.P.A. 11.03.01.013.03.[6] As to the Intoxilyzer 5000 that is at issue here, the standards are found in the Standard Operating Procedures Manual (SOP). This Court has treated such documents as “rules” for purposes of judicial review because they constitute the only materials by which the ISP has acted upon the I.C. § 18-8002A(3) authorization for the ISP to “prescribe by rule” approved testing instruments and methods. See, e.g., In re Schroeder, 147 Idaho 476, 479 n. 3, 210 P.3d 584, 587 n. 3 (Ct.App.2009); Archer v. State, Dep’t of Transportation, 145 Idaho 617, 620-21, 181 P.3d 543, 546-47 (Ct.App.2008); State v. DeFranco, 143 Idaho 335, 337, 144 P.3d 40, 42 (Ct.App.2006).
One of the ISP standards for maintenance and operation of the Intoxilyzer 5000, and the one at issue here, is expressed in SOP 2.2.1.1.2.1, which states, “The 0.08 solution should be changed approximately every 100 calibration checks or every month whichever comes first.” The referenced 0.08 solution is a solution that is used to calibrate the Intoxilyzer 5000 instrument to ensure that it will accurately measure a test subject’s breath alcohol content. The point of contention here is the meaning of the word “should” in this directive.
The majority holds that the word is recommendatory, not mandatory. While I agree that “should” in many contexts connotes only a recommendation, not a requirement, its interpretation must depend upon the context and the purpose of the provision in which the word appears. In my view, the majority’s interpretation that “should” as used in the SOP denotes only actions that are recommended but not mandatory — and hence are optional — is not a reasonable interpretation of the ISP’s intent and is not consistent with other sections of the SOP which make it plain that proper calibration is essential to the accurate functioning of the Intoxilyzer 5000. These other sections include SOP 1.2, which states, “Each approved breath-testing instrument is approved or disapproved for evidentiary testing based on the results of calibration checks performed as described in Section II.” SOP 1.2.1.2 states that for an Intoxilyzer 5000, “a valid calibration check must be performed with every breath test.” SOP 1.2.2 provides “if a calibration check produces results outside the acceptable range of values, the instrument may not be approved for evidentiary use for breath tests associated with that calibration check.” By these provisions, the ISP has plainly acknowledged that proper calibration, with a properly constituted calibration solution, is necessary to insure accurate test results. Hence, there is a clear recognition and intent that some standards are required for such calibration and calibration solutions.
But a “standard” that is merely a recommendation, and hence optional, is no standard at all — it is merely something that the officers maintaining and operating the Intoxilyzer 5000 may do if they wish or may disregard. As noted in footnote 4 of the majority opinion, the SOP uses the word “should” numerous times throughout the provisions governing use of the Intoxilyzer 5000 and another type of equipment, the Alco-Sensor. If this word conveys only a recommendation and not a requirement, then despite the acknowledgement in the SOP that proper calibration is essential for the accurate operation of the instrument, the ISP has adopted no actual ascertainable *389 standard for the frequency with which the calibration solution must be changed for either the Intoxilyzer 5000 or the Alco-Sensor (SOP 2.1.4.1.1 and 2.2.1.1.2.1), for the simulator temperature for calibration checks of either the Intoxilyzer 5000 or the Aleo-Sensor (SOP 2.1.2.1 and 2.2.4), for whether the operator need cheek the temperature before conducting a calibration check (SOP 2.1.2.1.1), for whether or when the AlcoSensor must be taken out of service after unsatisfactory calibration check runs (SOP 2.1.2.2.1.1), for whether calibration solutions for the Alco-Sensor and the Intoxilyzer 5000 may be used after the expiration date on the label, or, if so, for how long thereafter (SOP 2.1.4 and 2.2.1.1.1), for whether calibration solutions for the Intoxilyzer 5000 may be used when they do not produce values in an acceptable range (SOP 2.2.1.1.2), for whether the calibration check information must be entered into an instrument log (SOP 2.2.3.1), for whether the person monitoring the subject during the fifteen-minute waiting period before administration of the breath test must be a certified breath test operator (SOP 3.1.1), and for whether a new mouthpiece need be used for repeat tests (SOP 3.2.2.2). In other words, if “should” means “optional,” then the ISP’s “standards” for use of the Intoxilyzer 5000 are full of gaping holes — and seeming contradictions between the obvious acknowledgement that proper calibration is necessary for reliable test results and the utter absence of any defined standards for conducting such calibrations. The majority opines that to interpret “should” as meaning “must” would render the distinction between the two words “meaningless and illusory.” I respectfully respond that to interpret the word “should” in this circumstance as merely recommendatory and optional, renders “meaningless and illusory” every provision of the SOP in which that word is used. This could not possibly comply with the ISP’s statutory responsibility to prescribe “requirements” for evidentiary testing and calibration of testing equipment under I.C. §§ 18-8002A(3) and 18-8004(4). And if there are no adequately defined requirements, then the Intoxilyzer 5000 breath tests results are not admissible under I.C. § 18-8004(4) because there is then no defined “method” approved by the ISP.
This result, however, is obviously not what is intended by the ISP. The ISP clearly did intend to promulgate standards, not just make optional, take-or-leave suggestions for how an Intoxilyzer 5000 could be maintained and operated. The intent of the ISP can be effectuated, the validity of the standards salvaged, and the admissibility of BAC test results secured, by the reasonable interpretation that the ISP used the word “should” in the SOP as mandatory, introducing requirements that must be followed.
I would also point out that the majority’s solution of placing the burden on the driver to retain an expert witness to testify at the administrative hearing about the effect on the accuracy of the BAC test when an operator does not follow the “should” provisions of the SOP is not consistent with the statute that we are applying. I.C. § 18-8002A(7) imposes no such burden upon the driver. It provides that a driver’s license suspension must be vacated if the driver demonstrates at the administrative hearing that the test for alcohol concentration was “not conducted in accordance with the requirements of § 18-8004(4), Idaho Code,” i.e., when the tests were not administered in compliance with standards promulgated by the ISP. This statute presupposes that some “requirements” will have been promulgated, as the ISP is charged with doing. If there are no such requirements for calibration of the Intoxilyzer 5000, as the majority opinion seems to hold, even though calibration is plainly required for its accuracy, then Wheeler’s BAC test was not conducted in compliance with the requirements of I.C. § 18-8004(4) because the ISP has not fulfilled its obligations thereunder. However, as explained above, that is not an interpretation that I espouse.
In my view, the SOP was intended to, and does, set standards requiring compliance by Intoxilyzer 5000 operators. The more reasonable interpretation is that the requirement that the calibration solution “should be changed approximately every 100 calibration checks or every month whichever comes *390 first” is mandatory. I would also hold that 117 is not “approximately 100.”[7] Therefore, Wheeler has demonstrated that his BAC test was not administered in compliance with the requirements of I.C. § 18-8004(4), and it follows that the suspension of his driver’s license must be vacated pursuant to I.C. § 18-8002A(7)(d).
Accordingly, I would reverse the decision of the district court.

. Restricted driving privileges may be allowed after a first test failure. I.C. § 18-8002A(4).

. This administrative regulation promulgated by the Idaho State Police states:
"Breath tests shall be administered in conformity with standards established by the department. Standards shall be developed for each type of breath testing instrument used in Idaho, and such standards shall be issued in the form of standard operating procedures and training manuals."

. There is no need here to go into an analysis of the propriety of using the term "approximately” in a rule that is supposed to be setting defined standards, but the problems caused by its use are as obvious as the problems caused by the use of "should.”